NICHOLAS RECCHIA,

                    Plaintiff,

        v.

KELLOGG COMPANY,

                    Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 10-4899
        (JEI/KMW)

**OPINION**

**APPEARANCES:**

THE VIGILANTE LAW FIRM, P.C.
Jacqueline M. Vigilante, Esq.
99 North Main Street
Mullica Hill, NJ 08062
        and
RICHARDSON, GALELLA, & AUSTERMUHL
Allen E. Richardson, Esq.
142 Emerson Street
Suite B
Woodbury, NJ 08096
        Counsel for Plaintiff

DAY PITNEY LLP
Dennis M. Reznick
James W. Boyan III
One Jefferson Road
Parsippany, NJ 07054-2891
        and
VARNUM LLP
Lawrence J. Murphy
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
        Counsel for Defendant

**IRENAS**, Senior District Judge:

        This is an employment discrimination case.  Plaintiff

Nicholas Recchia ("Recchia") was terminated by Defendant Kellogg

Company ("Kellogg") as part of a restructuring program.  Recchia

brings claims against Kellogg under a variety of federal and

state employment law statutes.  Presently before the Court are

Kellogg's Motion for Summary Judgment (Dkt. No. 47) and Motion

to Seal (Dkt. No. 48).[1]  For the reasons given below, the Motion

for Summary Judgment will be granted and the Motion to Seal will

be denied.


**I.**

For the purposes of this Motion, the Court resolves any

factual disputes in favor of Plaintiff Nicholas Recchia.[2]

Recchia is a former employee of Defendant Kellogg Company, a

multinational food manufacturing company.  (SUMF[3] ¶ 1)  He worked

as a warehouse supervisor at a Kellogg facility in Blue Anchor,

New Jersey ("Blue Anchor") from 1981 until he was terminated on

September 1, 2009.  (*Id.* ¶ 2; SSMF[4] ¶ 1)  He was fifty-five years

old at the time.  (Compl. ¶ 16)

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

[2] In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986).

[3] SUMF refers to Defendant's Statement of Material Facts Not in Dispute submitted in support of its Motion for Summary Judgment (Dkt. No. 47) pursuant to Local Civ. R. 56.1.

[4] SSMF refers to Plaintiff's Supplemental Statement of Material Facts submitted in support of his opposition to Defendant's Motion for Summary Judgment (Dkt. No. 56).

Sometime in 2008, Recchia began drinking to excess, in part due to concerns about his son's substance abuse problems. (SUMF ¶ 3) In March 2009, Recchia checked into an inpatient rehabilitation center to treat his alcohol dependency. He was discharged from the facility in June 2009. (SSMF ¶¶ 2, 4) After his discharge from the treatment center, Recchia was diagnosed with kidney cancer. (*Id.* ¶ 4) He underwent surgery and received treatment for kidney cancer from June through August 2009. (*Id.;* SUMF ¶ 6) During this period, Recchia was on an approved leave of absence from work. (SSMF ¶ 3)

While Recchia was on his leave of absence, Kellogg was undergoing a restructuring through a program called K-Lean. (SUMF ¶ 7) The first step of this two-step program involved creating new job descriptions and organizational charts for various Kellogg facilities. The second step of the program was assessing the workforce at each facility to determine which employees were most qualified for the new jobs. (*Id.* ¶ 9) An outside consultant, Celerant, assisted Kellogg in creating the new job descriptions and facility-wide organizational charts. (*Id.* ¶ 10) Celerant recommended that the Blue Anchor facility adopt a new managerial structure with eleven instead of twelve supervisor positions. (*Id.* ¶ 14)

As part of the assessment process, managers at the Blue Anchor facility were to assess the existing supervisors to

determine where they would be placed within the new
organizational structure, if they were placed at all. (SSMF
¶ 15) Kellogg's Corporate Human Resources Department developed
an assessment form for teams to use in conducting the
assessments. (SUMF ¶ 11) Each candidate was assessed on each
criterion on a scale of 1 to 5, with 5 being the highest score.
(*Id.* ¶ 12) The minimum score needed to qualify for a position
was 2.5; positions were to be awarded to the individual with the
highest score of those assessed for that position. (*Id.* ¶ 13)

Ron Daubenhauser, the Blue Anchor plant director, and
Christine Ferrigno, the human resources manager, determined that
Recchia was a candidate for three positions: Operations
Services Manager, Operations Supervisor, and Operations
Supervisor – Logistics. (SSMF ¶ 20) The first position was a
level 2 position; the second two were level 3 positions. (SUMF
¶ 15) Level 2 positions were higher on the organizational chart
than level 3 positions. (Def.'s Ex. 4) Recchia was
subsequently disqualified from the Operations Services Manager
and Operations Supervisor positions, as he was assessed at 2.08
and 2.35 for those positions respectively. (SUMF ¶ 16)

Although Recchia qualified for the Operations Supervisor –
Logistics position with a score of 2.58, another employee, Juan
Ferriero, received a higher score of 3.0 and as a result was
selected for that position. (*Id.* ¶¶ 17-18) Ferriero is one

year older than Recchia. (*Id.* ¶ 21) Recchia was assessed "without a position."[5] (SSMF ¶ 46)

The K-Lean assessment was completed in April 2009 while Recchia was on his leave of absence. (SUMF ¶ 22) Instead of terminating him, Kellogg informed Recchia that he had been assessed without a position but could remain on a leave of absence. When he returned to work, he would be considered for any available openings for which he was qualified. (*Id.* ¶¶ 22-23) Recchia was released to return to work on September 1, 2009. At that time, there were two Operations Supervisor positions open. (SSMF ¶ 52) However, based on his score of 2.35 for that position, Kellogg deemed that Recchia was not qualified and terminated him. (SUMF ¶ 24)

At the time of his termination, Recchia received a written Employee Separation Packet, which included, among other things, a benefits summary, the Kellogg Company Severance Benefit Plan ("Severance Plan"), and a Separation Agreement and General Release ("Release"). (Compl. Ex. B; SSMF ¶ 55) The benefits summary explained the various benefits for which Recchia was eligible, including continuation of health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29

---

[5] In addition to Recchia, one other Blue Anchor employee, Anne Mrozchek, was assessed without a position. She scored 1.58, 1.67, and 1.75 for the positions for which she was assessed. (SSMF ¶¶ 48, 50) Morzchek was forty-four years old at the time. (Compl. Ex. B)

U.S.C. §§ 1161-69, 42 U.S.C. §§ 3000bb-1 to -8. (Compl. Ex. B)
The packet also contained two lists created to comply with the
Older Workers Benefit Protection Act of 1990 ("OWBPA"), 29
U.S.C. § 626(f). (*Id.*) One list provided the job titles and
birthdays of the Blue Anchor employees who were selected for
termination and thus eligible for the Severance Plan; the other
gave the job titles and birthdays of ineligible employees. (*Id.*)

Under the Severance Plan, Recchia was eligible to receive
severance pay and benefits for a period of twenty-six weeks.
(Def.'s Ex. 10 ("Release") ¶ 2(a)) However, Recchia's receipt
of those benefits was contingent upon him signing the Release
and waiving any possible claims against Kellogg (Def.'s Ex. 9
("Severance Plan"), at 2, 6; Release ¶¶ 2, 13), including any
claims arising under Title VII, the Age Discrimination in
Employment Act ("ADEA"), as amended by the OWBPA, 29 U.S.C.
§§ 621-34, the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001-1461, as well as any claims for
discrimination. (Release ¶ 13) The Release advised Recchia to
consult an attorney and stated that Recchia had a minimum of
forty-five days – until October 16, 2009 – to consider the
Release. (*Id.* ¶ 19) It further provided that Recchia could
revoke the Release within seven days of signing it. (*Id.* ¶ 20)
Finally, the Release specified that the OWBPA lists were

attached and that Recchia acknowledged receiving them.  (*Id.*
¶ 21)

Although the Severance Plan allowed Kellogg to begin making
severance payments and providing benefits to Recchia before he
had signed the Release, it explicitly stated that

> the entitlement to any severance benefits under this
> Plan is contingent upon the Employee's submission of
> an unrevoked form.  Therefore, if an Employee fails to
> submit the signed form to Kellogg, or submits the
> signed form but later revokes it, no additional
> severance benefits will be paid to the Employee and
> Kellogg . . . may offset the amount of any severance
> payments already made from sums otherwise due to the
> Employee . . . , and if the full amount of said
> severance payments are not fully offset, Employee
> shall pay the balance to Kellogg upon demand.

(Severance Plan 6)  Kellogg began providing severance payments
and benefits to Recchia on the day he was terminated, September
1, 2009.  (SUMF ¶ 28)

Sometime between September 1, 2009, and October 6, 2009,
Recchia consulted with an attorney, Jacqueline Vigilante,
regarding the Severance Plan and the Release.  (SSMF ¶ 70)  On
October 6, Ms. Vigilante sent a letter to Kellogg indicating
that she had reviewed the Employee Separation Packet and that
she believed there was "potential liability for Kellogg's."
(Def.'s Ex. 11, at 1)  The letter stated that Recchia would
"accept a revised severance package including the equivalent of
eighteen months [sic] severance with full contribution to the
pension plan so that Mr. Recchia can make his full 30 years

employment." (*Id.* at 2)  It also asked for an additional thirty days to consider the Release "while the parties' [sic] discuss and consider the information contained in this correspondence." (*Id.* at 3)

On October 9, seventeen days before the end of the forty-five-day period, Patrick Cronin, Associate Human Resources Business Partner, terminated Recchia's severance pay and benefits.  (SSMF ¶ 72)  At the same time, Ms. Vigilante's letter was sent to the Kellogg ERISA Administrative Sub-Committee ("Committee"), which is charged with administering the Severance Plan.  (Pl.'s Ex. 18)  The Committee considered Recchia's request for an exception to the Severance Plan's prohibition on the accrual of "additional credited, vesting or eligibility service . . . for purposes of any such retirement plan." (Severance Plan 4; Pl.'s Exs. 16, 18)  On November 2, the Committee denied Recchia's request for an exception, stating that the Committee could not deviate from the Severance Plan's terms.  (Pl.'s Ex. 16)

During this time frame, Recchia was still being treated for kidney cancer and alcohol dependency.  In addition, his son, who was covered by Recchia's insurance policy, was undergoing treatment for substance abuse.  (SSMF ¶¶ 77-78)  On October 28, 2009, Recchia and his wife, Maria Recchia, sought to have their son admitted to an inpatient treatment facility.  While there,

they were told that their son's coverage had been denied, and they paid for two days of his treatment out of pocket. (*Id.* ¶¶ 79-80)  This was the first time Recchia became aware that he was no longer receiving severance pay and benefits. (*Id.* ¶ 79) The following day, Recchia submitted a COBRA coverage election form to Kellogg, in which he requested coverage for himself and his son. (Pl.'s Ex. 2, at Ex. E)  By November 9, Recchia had obtained COBRA coverage. (Pl.'s Ex. 22)

On November 1, the inpatient treatment center released Recchia's son because they were not receiving payment for his treatment. (SSMF ¶ 81)  He took a bus to Camden, New Jersey, where he sold his possessions for illegal drugs and stayed for three days before Recchia and his wife found him. (*Id.* ¶ 83) On November 9, Recchia's son was admitted to another treatment center. (Pl.'s Ex. 2 ¶ 21)  That same day, Recchia signed the Release after talking to Ms. Vigilante (Release 7; Pl.'s Ex. 3 ("Recchia Dep."), at 197:17-22), and Kellogg reinstated his severance payments and benefits. (SSMF ¶ 91)  Kellogg paid Recchia the full twenty-six weeks of severance pay and provided benefits during that entire period. (SUMF ¶ 32)

On July 1, 2010, the Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue to Recchia. (Compl. Ex. A)  Recchia filed his Complaint on September 24, 2010. (Dkt. No. 1)  He brings six counts against Kellogg,

including fraud and duress with respect to the Release (Count I), age discrimination and retaliation in violation of the ADEA (Counts II and III), disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count IV), unlawful interference in violation of ERISA (Count V), and age and disability discrimination and retaliation in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 to -49 (Count VI). (*Id.*) Kellogg moves for summary judgment on all counts. (Dkt. No. 47)

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district

court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

## III.

The threshold question before the Court is whether Recchia waived his claims against Kellogg when he signed the Release. An employee may waive his claims against an employer as long as he does so voluntarily and knowingly. *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 522 (3d Cir. 1988); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 894-95 (1996) (holding that release of "any employment-related claims" is permissible under ERISA); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974) (noting that an employee may enter into an agreement to waive Title VII claims as long as "the settlement was voluntary and knowing"); *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x 728, 730-31 (3d Cir. 2005) (applying this standard to a waiver of ADA and

ERISA claims); *Swarts v. Sherwin-Williams Co.*, 244 N.J. Super. 170, 176 (1990) ("The statutory protections against age discrimination under the NJLAD do not bar knowing, willful waiver of those protections.").  In examining the validity of such a waiver, courts in the Third Circuit and New Jersey use a totality of the circumstances test.  *Coventry*, 856 F.2d at 522-23; *see also Geraghty v. Ins. Servs. Office, Inc.*, 369 F. App'x 402, 405-06 (3d Cir. 2010); *Swarts*, 244 N.J. Super at 177 (adopting the Third Circuit's totality of the circumstances test).  The court "may also consider 'whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest.'"  *Cuchara*, 129 F. App'x at 731 (quoting *W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995)).

    In addition, a waiver of ADEA claims must meet certain statutory requirements as outlined in the OWBPA, 29 U.S.C. § 626(f)(1).  "The party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary pursuant to [§ 626(f)(1)]."  *Id.* § 626(f)(3).

    Kellogg moves for summary judgment on all counts of Recchia's Complaint on the basis that Recchia waived his claims when he signed the Release.  Recchia's primary argument is that the Release is invalid because he signed it under duress.  In

the alternative, he claims that the Release is invalid because
it fails the totality of the circumstances test.  Finally,
Recchia argues that even if the Release is valid under the
totality of the circumstances test, it is still invalid as to
his ADEA claims because it did not comply with the OWBPA, 29
U.S.C. § 626(f)(1).  The Court addresses each argument in turn.

**A.**

Recchia's main argument is that the Release is invalid
because he signed it under duress.  There are two elements to
economic duress under New Jersey law[6]:  "1.  The party alleging
economic duress must show that he has been the victim of a
wrongful or unlawful act or threat, and 2.  Such act or threat
must be one which deprives the victim of his unfettered will."
*Continental Bank of Pa. v. Barclay Riding Academy*, 459 A.2d
1163, 1175 (N.J. 1983) (quoting 13 Samuel Williston, *A Treatise
on the Law of Contracts* § 1617, at 704 (3d ed. 1970)).  The key
factor in determining whether duress exists is "the wrongfulness
of the pressure exerted."  *Id.*  It is enough that an act be

---

[6] Although the Release provides that Michigan law governs any disputes
arising under it (Release ¶ 17(c)), the threshold question of whether the
Release is valid is examined under New Jersey law.  *See, e.g.*, *Siegel v.
Norwegian Cruise Line*, No. 00-6271, 2001 WL 1905983, at *4 (D.N.J. May 14,
2001) (analyzing a claim of economic duress under New Jersey law where a
choice-of-law provision specified that Florida law would apply).  In
addition, both parties have relied on New Jersey law in presenting their
arguments.

contrary to moral or equitable standards to constitute a
wrongful act. *Id.*

Because of this test's fluidity, each situation must be
examined on a case-by-case basis "to determine if the
threatening party acted wrongfully." *Id.* (citing *West Park
Ave., Inc. v. Ocean Twp.*, 224 A.2d 1, 5 (N.J. 1966)). Courts
generally require "the party alleging financial difficulty [to]
allege that it was contributed to or caused by the one accused
of coercion." *Id.* at 1176. Duress is usually not present where
there is adequate consideration. *Id.*

Bearing these factors in mind, the Court finds that Recchia
did not sign the Release under duress. Recchia alleges that
Kellogg contributed to or caused his financial distress, namely
his lack of medical insurance and his inability to cover medical
bills, when it stopped providing benefits. (Pl.'s Br. in Opp'n
("Pl.'s Br.") 10) He further argues that Kellogg was obligated
to pay him severance and benefits while he considered the
Severance Plan and therefore acted wrongfully when it withdrew
those benefits. (*Id.* at 10-11) But even if Kellogg did
contribute to or cause some of Recchia's financial distress, a
plain reading of the Severance Plan shows that Kellogg did not
commit a wrongful act.

The Severance Plan sets forth the circumstances and
procedures under which an eligible terminated employee may

receive severance benefits for a specified period of time known as the Severance Leave of Absence or SLOA.  Severance benefits include severance pay and continued participation in employee benefit plans, such as "medical, dental, prescription drug, life insurance and voluntary programs (including supplemental life insurance and long-term care)." (Severance Plan 5) Participation in employee benefit plans is predicated on the employee "(i) pay[ing] the monthly premium or contribution rate applicable to 'active' employees, (ii) compl[ying] with the other terms of the respective plan, and (iii) compl[ying] with the terms of the Release of Claims." (*Id.* at 5-6)

Under the heading "CONDITIONS FOR SEVERANCE BENEFITS," the Severance Plan specifies that "an Employee is eligible to begin receiving severance benefits if he . . . , [*inter alia*], properly executes and submits to Kellogg a form of release of claims . . . within the time period specified, and does not thereafter revoke the Release of Claims." (*Id.* at 2)  The Severance Plan also has a section titled "SEVERANCE BENEFITS CONTINGENT UPON UNREVOKED RELEASE."  That section reads,

> At or before the commencement of the SLOA, an eligible Employee will be given the Release of Claims . . . . The Employee will be informed of the deadline for signing and returning the form to Kellogg, and of any applicable revocation period.  *Although the Employee's severance pay may begin before the expiration of such deadline and revocation period, the entitlement to any severance benefits under this Plan is contingent upon the Employee's submission of an unrevoked form.*

15

>Therefore, if an Employee fails to submit the signed
>form to Kellogg, or submits the signed form but later
>revokes it, no additional severance benefits will be
>paid to the Employee and Kellogg and/or the Employee's
>Employer may offset the amount of any severance
>payments already made from sums otherwise due to the
>Employee . . . , and if the full amount of said
>severance payments are not fully offset, Employee
>shall pay the balance to Kellogg upon demand.

(*Id.* at 6) (emphasis added)

This language leaves no doubt that Kellogg's obligation to make severance payments and provide benefits under the Severance Plan is triggered only *after* the employee signs the Release. Further, if the employee revoked the Release, Kellogg would stop providing severance pay and benefits and could seek reimbursement for any severance pay and benefits that it had already paid. (*Id.*) Kellogg could choose to provide severance pay and benefits to an employee before he signed the Release, as happened here; however, nothing in the Severance Plan obligates Kellogg to do so.

As Kellogg was not required to provide severance pay and benefits to Recchia until after he signed the Release, its decision to stop providing benefits did not constitute a wrongful act. Indeed, if Recchia had declined to sign the Release, Kellogg would have been entitled to seek repayment of the severance payments it had already made to him. (*Id.*) Therefore, Kellog did not commit a wrongful act.

Furthermore, nothing in the record indicates that Recchia was deprived of his free will. Recchia might have faced economic pressure due to the lack of health insurance coverage for him and his son.[7] But that kind of pressure does not create economic duress. *See, e.g.*, *Sauter v. Fed. Home Loan Bank of N.Y.*, 2009 WL 2424689, at *9 (D.N.J. Aug. 5, 2009) ("Although Sauter faced economic pressure in the sense that she was offered the economic incentive of healthcare coverage in exchange for releasing any claims she might have, this pressure did not affect the voluntariness of the waiver, and therefore does not constitute economic duress."). As the Third Circuit has noted, "the law is clear that the existence of financial pressure to sign a waiver is insufficient to establish that it was executed involuntarily." *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 295 (3d Cir. 2003).

Ample record evidence supports finding that the cessation of benefits did not create economic pressure that rose to the level of duress. Recchia had other insurance options available to him. While there is some question as to when Recchia became aware of his various insurance options, there is no question that he knew of them when he signed the Release. In his deposition, Recchia stated that after he learned that Kellogg

---

[7] Recchia's economic duress argument focuses on his lack of medical insurance and his inability to cover medical bills.

had halted his severance benefits, he and his wife discussed
having her health insurance cover both Recchia and their son.
(Recchia Dep. 106:3-107:14)  He also testified that in late
October, a Kellogg representative told him that he was eligible
for retiree medical insurance coverage if he chose to enroll in
it.  (*Id.* at 103:16-24)

Recchia also knew he could extend his coverage through
COBRA before he signed the Release.  First, the benefits summary
in the Employee Separation Packet explicitly stated that Recchia
was eligible to continue his health insurance through COBRA.
(Compl. Ex. B)  Second, Recchia actually elected to enroll in
COBRA on October 29, 2009, eleven days before he signed the
Release.  (Release 7; Pl.'s Ex. 2, at Ex. E)  Indeed, by
November 9, the day he signed the Release, Recchia had obtained
COBRA coverage at a rate of $225.77 per month for himself and
his son.  (Pl.'s Ex. 22; Pl.'s Ex. 2, at Ex. E)  The COBRA
election form stated that Recchia's COBRA coverage was effective
October 10, 2009, so his medical bills would have been covered
retroactively.  (Pl.'s Ex. 2, at Ex. E)  Therefore, Recchia's
election of COBRA coverage would have alleviated most of the
economic concerns that he cites as a basis for duress.

Another factor counseling against finding duress is that

Recchia consulted with counsel before signing the Release.[8]
Indeed, Recchia's testimony that he spoke to his attorney the
same day he signed the Release and that he followed her advice
with respect to the Severance Plan weighs heavily in favor of
finding that he was not under duress.  (Recchia Dep. 73:13-16;
197:17-22)

Recchia argues that Kellogg interfered with his ability to
consult counsel when it treated Ms. Vigilante's October 6 letter
as a rejection and immediately stopped making severance payments
and providing benefits.  Recchia's argument is unpersuasive.
First, the record shows conclusively that Recchia did not know
that Kellogg had ceased providing severance pay and benefits
until October 28, 2009, approximately two weeks after the forty-
five-day consideration period had ended.  The Court finds it
difficult to see how Kellogg's decision to cease payments on
October 9 could have interfered with Recchia's ability to
consult with counsel during the consideration period when he was
not even aware that Kellogg had done so.

---

[8] Kellogg argues that having the benefit of counsel defeats a duress
defense and cites Third Circuit case law in support of its argument.  (Def.'s
Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") 12)  However, the
cases on which Kellogg relies construe Pennsylvania, not New Jersey, law.
*See, e.g.*, *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911 (3d Cir. 1986)
(analyzing plaintiff's duress defense under Pennsylvania law).  By contrast,
there is no such clear law in New Jersey, and this Court is unwilling to
adopt Pennsylvania's rule.  *Cf. Tak Commc'ns, Inc. v. West Deptford Townhome
Assocs. Ltd. P'ship*, No. 91-0121, 1992 WL 296535, at *6 (E.D. Pa. Oct. 8,
1992) ("Although it is clear that Tak's consultation with counsel is relevant
to its state of mind, . . . under New Jersey law, the opportunity to consult
with counsel does not preclude a claim of economic duress as a matter of
law.").

Second, Kellogg was entitled to stop payments after the consideration period had passed. Although the Court agrees with Recchia that the October 6 letter did not constitute a rejection in and of itself, the letter along with Recchia's failure to sign the Release within the forty-five-day period *was* a rejection of the Severance Plan. Thus, by October 28, Kellogg had no obligation to provide severance pay and benefits. Indeed, Kellogg had no obligation to accept the Release from Recchia when he signed it on November 9, yet Kellogg chose to honor it anyway. As such, the argument that Kellogg's termination of benefits and severance pay somehow interfered with Recchia's ability to consult with counsel is unpersuasive.

Finally, Recchia received adequate consideration in exchange for signing the Release. As discussed above, Recchia was not entitled to any severance pay or benefits. The Severance Plan specifically states, "Severance benefits under this Plan are extra compensation to eligible Employees, not compensation that the Company is required to pay outside of this Plan. Therefore, the severance benefits will be provided as consideration for the Employee's execution of and compliance with the Release of Claims . . . ." (Severance Plan 3) In exchange for signing the Release, Recchia received twenty-six weeks of severance pay and benefits, which he would not have received otherwise. (Release ¶ 2(a)) These benefits are

adequate consideration such that a jury could not reasonably
find that Recchia signed the Release under economic duress.[9]
Accordingly, the Court finds that Recchia was not under duress
when he signed the Release.[10]  Summary judgment will be granted
in favor of Kellogg on Count I.


**B.**

Recchia next argues that the Release is invalid under the
totality of the circumstances test.  Under that test, a court
considers:

> (1) the clarity and specificity of the release
> language; (2) the plaintiff's education and business
> experience; (3) the amount of time plaintiff had for
> deliberation about the release before signing it; (4)
> whether plaintiff knew or should have known his rights
> upon execution of the release; (5) whether plaintiff
> was encouraged to seek, or in fact received benefit of
> counsel; (6) whether there was an opportunity for
> negotiation of the terms of the Agreement; and (7)
> whether the consideration given in exchange for the
> waiver and accepted by the employee exceed[ed] the
> benefits to which the employee was already entitled by
> contract law.

*Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1538 (3d Cir. 1997)

(quoting *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir.

---

[9] To the extent that Recchia may be making an emotional duress argument,
the Court finds that argument ineffective for substantially similar reasons
to those discussed in connection with Recchia's economic duress arguments.
*See Sauter*, 2009 WL 2424689, at *9-10 (using the same analysis to consider
plaintiff's economic and emotional duress defenses).

[10] Recchia also argues that the Release is invalid because Kellogg "placed
Mr. Recchia under undue duress" in violation of the Older Workers Benefit
Protection Act (OWBPA) of 1990.  (Pl.'s Br. 16-17)  Because the Court
determines that Recchia did not sign the release under duress, this argument
fails as well.

1988)) (alteration in original).  Every factor weighs in favor

of finding that Recchia knowingly and voluntarily waived his

claims against Kellogg.


       *1.  Clarity and specificity of the Release*

The language of the Release is clear and specific.  Paragraph 13

of the Release states,

> In consideration of the compensation and benefits
> provided pursuant to this Agreement . . . ,
> Employee . . . irrevocably . . . and unconditionally
> releases, waives and forever discharges
> [Kellogg] . . . from *any and all claims or causes of
> action* that Employee had, has or may have, known or
> unknown, relating to Employee's employment with and/or
> termination from the Company up until the date of this
> Agreement, *including but not limited to*, any claims
> arising under Title VII of the Civil Rights Act of
> 1964, as amended, Section 1981 of the Civil Rights Act
> of 1866, as amended, the Civil Rights Act of 1991, as
> amended, the Family and Medical Leave Act of 1993, as
> amended, the *Age Discrimination in Employment Act, as
> amended by the Older Workers Benefit Protection Act of
> 1990*, the of 1990 [sic], as amended, the *Employee
> Retirement Income Security Act; claims under any other
> federal, state or local statute, regulation or
> ordinance; claims for discrimination* or harassment of
> any kind, breach of contract or public policy,
> *wrongful or retaliatory discharge*, defamation or other
> personal or business injury of any kind; claims of
> representation, misrepresentation, or negligent
> representation, and any and all other claims to any
> form of legal or equitable relief, damages,
> compensation or benefits . . . , or for attorneys fees
> or costs.

(Release ¶ 13) (emphasis added)  This language leaves no doubt

as to the nature of the claims that Recchia waived in exchange

for severance pay and benefits.  *See, e.g., Yousef v. Capital*

*One Servs., Inc.*, No. 11-1687, 2011 WL 3739362, at *4 (D.N.J. Aug. 24, 2011) (finding similar language to provide "a clear, thorough, and definitive explanation as to what claims were released"). Although Recchia argues that the claims were not "set forth in an easy-to-read, bulleted list," there is no requirement that the claims be presented in that format. *See id.; Moroni v. Penwest Pharm. Co.*, No. 07-5546, 2009 WL 3335504, at *2, *6 (D.N.J. Oct. 13, 2009) (holding that similar language, in a similar format, was "clear and specific").

Recchia also claims that the Release is not specific because it fails to list "several of the statutes covering Mr. Recchia's discrimination claims, including the ADA and NJLAD claims." (Pl.'s Br. 18) Again, this argument is unavailing. Courts in this Circuit have repeatedly held that failure to mention a particular statute does not invalidate a release of claims. *See, e.g.*, *Geraghty*, 369 F. App'x at 406 (holding that a release precluded the plaintiff's CEPA claim despite not specifically listing the CEPA statute where it stated that the plaintiff released the employer from "any and all claims . . . , including, but not limited to" several federal and state statutes); *Cobb v. George Weston Bakers Distrib., Inc.*, No. 10-0676, 2012 WL 2344452, at *5 (D.N.J. June 19, 2012) ("[T]he Release plainly and clearly releases *any and all* causes of action Plaintiff had against Defendants."); *Weinberg v. Interep*

23

*Corp.*, No. 05-5458, 2006 WL 1096908, at *4 (D.N.J. Apr. 26, 2006) (finding that the plaintiff could not bring his NJLAD claim where he had agreed to release "all claims arising under state anti-discrimination statutes and any claims for wrongful termination or unlawful discrimination); *Mosley v. Bay Ship Mgmt.*, 174 F. Supp. 2d 192, 197 (D.N.J. 2000) (finding that plaintiff's agreement to "drop his beef" against defendant constituted a knowing and voluntary waiver of his right to bring a NJLAD claim); *see also Swarts*, 364 N.J. Super. at 178 (finding that the plaintiff had waived his NJLAD claim even though the release did not specifically list the NJLAD).

The Release here clearly states that Recchia waives "any and all claims or causes of action" against Kellogg, "including, but not limited to" several federal statutes, including, *inter alia*, the ADEA and ERISA, as well as "claims under any other federal, state or local statute, regulation or ordinance; claims for discrimination or harassment of any kind . . . , [and] wrongful or retaliatory discharge." (Release ¶ 13) Based on this language, it is clear that the first factor weighs in favor of finding the Release valid.

### 2. *Education and business experience*

Recchia also has sufficient education to understand the Release. Recchia is a high school graduate and attended college

24

for two years, although he did not complete his degree.  (Pl.'s
Ex. 31 ¶ 2)  This level of education is enough "to satisfy the
'minimal threshold' necessary for this factor."  *Cobb*, 2012 WL
2344452, at * 6 (quoting *Ponzoni v. Kraft Gen. Foods, Inc.*, 774
F. Supp. 299, 310 (D.N.J. 1991)); *see also Riddell v. Med.
Inter-Ins. Exch.*, 18 F. Supp. 2d 468, 472 (D.N.J. 1998) (finding
that a plaintiff without a college education whose work was
mainly clerical could understand a release).


### 3.  Time for deliberation

Recchia had adequate time to consider the Release before
signing it.  Courts focus on the time provided rather than the
time actually taken to consider a release.  *See, e.g.*, *Cobb*,
2012 WL 234452, at *6; *Sauter*, 2009 WL 2424689, at * 5.  In this
case, Kellogg provided Recchia with at least forty-five days to
consider the Release.  (Release ¶ 19)  In addition, the Release
specified that Recchia could revoke the Release within seven
days of signing it.  (*Id.* ¶ 20)  Forty-five days is more than
enough time to consider the Release, especially in light of the
fact that this period was a floor.  *See Cuchara*, 129 F. App'x at
731 (finding that twenty-one days was a sufficient amount of
time to contemplate a release).  In fact, Recchia signed the
Release almost seventy days after he first received it.
(Release 7)

Recchia argues that Kellogg interfered with and shortened the consideration period when it stopped paying severance benefits to Recchia. (Pl.'s Br. 19-20) This argument fails for three reasons. First, Recchia's argument is based on the premise that he was entitled to receive severance payments through the consideration period and that Kellogg's decision to halt payments somehow removed his ability to consider the terms of the Release. But as discussed above, any severance benefits Recchia received prior to signing the Release were paid solely at Kellogg's discretion and were contingent upon him eventually signing the Release. Thus, Recchia cannot use Kellogg's decision to cease payments to show that it shortened the consideration period. Second, as the Court previously noted, Recchia was not aware that Kellogg had stopped severance payments and benefits until approximately two weeks after the end of the consideration period. Third, even if it were the case that Kellogg shortened the consideration period, Recchia still had over thirty days to consider the Release. In fact, Recchia took an additional thirty days after the initial forty-five-day period before he actually signed the Release. Taken together, these facts show that there is no dispute that Recchia had adequate time in which to consider the Release.

### 4. *Knowledge of rights*

The record is clear that Recchia knew his rights when he signed the Release. In his deposition, Recchia admitted that he knew he was releasing Kellogg from any possible claims when he signed the Release (Recchia Dep. 118:9-17) and that he had no intention of bringing any claims against Kellogg at that time. (*Id.* at 118:18-119:7); *see, e.g.*, *Wastak*, 342 F.3d at 294-95 (finding that a release valid where the plaintiff testified that he understood he was receiving salary continuation in exchange for agreeing not to bring a lawsuit against his employer). Further, Recchia sought counsel over a month before he signed the Release on November 9, 2009.

On October 6, 2009, Ms. Vigilante sent a letter to Kellogg indicating that she believed Recchia's termination "was based upon his disability, the supervisors' perception of his disability and/or use of federal protected medical leave." (Def.'s Ex. 11, at 2) The letter also said the layoff "was in violation of the Older Workers Benefits Protection Act." (*Id.*) In his deposition, Recchia stated that he read the letter before Ms. Vigilante sent it to Kellogg and that he agreed with its contents. (Recchia Dep. 78:6-16, 81:22-82:3) Based on this record evidence, it is clear that Recchia knew his rights when he executed the release. Thus, this factor weighs in favor of validity.

## 5. *Benefit of counsel*

The above evidence is also relevant to whether Recchia was encouraged to seek, or in fact received the benefit of counsel. "[T]he more important consideration is whether consultation with a lawyer was encouraged . . . , rather than whether the plaintiff in fact received the benefit of counsel." *Cirillo*, 862 F.2d at 454. Courts consistently find that it "normally suffice[s] for the employer to suggest that the employee may wish to consult an attorney." *Id.; see also Sauter*, 2009 WL 242689, at *6 (holding that being encouraged to seek counsel was sufficient to meet this factor).

There is no question that Kellogg encouraged Recchia to seek counsel. The cover page of the Separation Packet clearly says, "Please review the enclosed documents thoroughly and if you desire, consult with an attorney." (Compl. Ex. B) In addition, the Release itself states, "Employee has been advised to consult an attorney before signing this Agreement." (Release ¶ 19) Furthermore, Recchia received the benefit of counsel. There is abundant record evidence that he contacted and consulted with Ms. Vigilante before he signed the Release. Indeed, he spoke with her the same day that he signed the Release.

Recchia contends that Kellogg undermined his ability to consult with counsel when it stopped paying severance benefits

upon receipt of Ms. Vigilante's October 6 letter. (Pl.'s Br. 21-22) Recchia also states that Pat Cronin told him Kellogg ceased payments because Recchia "lawyered up" (Recchia Dep. 122:23-25), which, he argues, shows that the cessation of benefits was meant to interfere with Recchia's right to consult with counsel. This argument is unsuccessful. Recchia continued to consult with Ms. Vigilante after Kellogg ceased paying severance benefits, and in fact did so the day he signed the Release. Further, as discussed above, Recchia did not know that Kellogg had stopped paying benefits until after the consideration period had ended. Although Kellogg could have taken a different course of action rather than terminating Recchia's benefits, its decision to do so did not interfere with Recchia's ability to consult with counsel. Thus, this factor also weighs in favor of finding validity.

### 6. *Opportunity for negotiation*

"The ability to negotiate the terms of a release suggests that the atmosphere surrounding its execution was not oppressive and thus indicates a voluntary waiver." *Sauter*, 2009 WL 2424689, at *7. However, the absence of an opportunity to negotiate does not prove invalidity. *Cirillo*, 862 F.2d at 454 n.4. But "to the extent such absence and other evidence suggest

that the atmosphere surrounding the execution was oppressive, it is, of course, a relevant consideration." *Id.*

In this case, Recchia attempted to negotiate the terms of the Release but was ultimately unsuccessful. In addition to stating that she believed there was "potential liability for Kellogg" (Def.'s Ex. 11, at 1), Ms. Vigilante also indicated in her October 6 letter that Recchia would be willing to sign the Release if he received "a revised severance package," which would include "the equivalent of eighteen months [sic] severance with full contribution to the pension plan." (*Id.* at 3) In the alternative, Recchia was willing to "accept employment for the next eighteen months as a full time employee with Kellogg's with full benefits as existed on the date of his separation of September 1, 2009." (*Id.*) The letter sought to modify the Severance Plan so that Recchia would be able to "retire from Kellogg's after 30 full years of service." (*Id.*)

Upon receipt of the letter, Cronin ordered the immediate cessation of benefit payments to Recchia. (Pl.'s Ex. 21) However, Kellogg simultaneously forwarded Recchia's request to the Kellogg ERISA Administrative Sub-Committee ("Committee"), which was charged with administrating the Severance Plan. (Pl.'s Ex. 18) The Committee considered Recchia's request and on November 2, sent him a letter stating that under the terms of the Plan, they would not be able to "bridg[e] to eligibility for

any additional early retirement benefits." (Pl.'s Ex. 16)
Thus, the Committee denied Recchia's request to modify the terms
of the Release. (*Id.*)

Based on these facts, the Court finds that this factor
weighs in favor of validity. The record shows that Kellogg did
consider Recchia's request to change the terms of his severance
package. Even though the ultimate outcome was unfavorable to
Recchia, the pertinent question is whether he had an opportunity
to negotiate, not whether the negotiation resulted in more
favorable terms for him. *Cf. Cobb*, 2012 WL 2344452, at *7
(noting that the critical inquiry is whether plaintiff has an
opportunity to negotiate). As such, Recchia had an opportunity
to negotiate the terms of the Release.


### 7. *Adequacy of consideration*

The final factor is whether Recchia received adequate
consideration in exchange for signing the Release. As discussed
above, in exchange for signing the Release, Recchia received
twenty-six weeks of severance pay as well as the continuation of
benefits during those weeks. Recchia was not entitled to
severance pay or benefits by either contract or law. Therefore,
the Court finds that he received meaningful consideration in
exchange for his waiver of claims. *See Cirillo*, 862 F.2d at

454-55; *Cobb*, 2012 WL 2344452, at *7; *Yousef*, 2011 WL 3739362, at *7.[11]

In light of these factors, Recchia's execution of the Release was knowing and voluntary under the totality of the circumstances test.  Therefore, the Release is valid as to Recchia's ADA, ERISA, and NJLAD claims, and summary judgment will be granted for Kellogg on Counts IV, V, and VI.

## C.

Recchia next argues that even if the Release is valid under the totality of the circumstances test, it does not meet the requirements of the OWBPA, thus rendering the Release invalid as to his ADEA claim.

The OWBPA is an amendment to the ADEA that Congress passed with two purposes:  first, to affirm that age discrimination is unlawful with respect to all employee benefits; and second, to protect older workers from being coerced into releasing their rights under the ADEA.  *Long*, 105 F.3d at 1534 (citing S. Rep.

---

[11] Recchia argues that he did not receive adequate consideration in exchange for signing the Release because the pay and benefits he would have received had he not been terminated would have far exceeded the severance pay and benefits he received under the here.  Courts consistently examine the benefits to which a plaintiff is entitled *after* termination, not what he might have been entitled to had he not been terminated.  *See, e.g., Cobb*, 2012 WL 2344452, at *7; *Yousef*, 2011 WL 3739362, at *7; *Sauter*, 2009 WL 2424689, at *8; *Moroni*, 2009 WL 3335504, at *6; *Riddell*, 18 F. Supp. 2d at 474.  Almost without exception, a plaintiff would receive more benefits from continuing to be employed than he would receive from being terminated.  Using that standard as a baseline would necessitate finding against validity for this factor in almost every case.

No. 263, 101st Cong., 2d Sess. 2 (1990)). To effect the second goal, the OWBPA requires waivers of ADEA claims to meet certain minimum requirements. Those requirements are set forth in 29 U.S.C. § 626(f):

> (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. . . . [A] waiver may not be considered knowing and voluntary unless at a minimum--
>
> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual . . . ;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F) . . . (ii) if a waiver is requested in connection with an . . . employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;
>
> (H) if a waiver is requested in connection with an . . . employment termination program . . . the

employer . . . informs the individual in writing in
a manner calculated to be understood by the average
individual eligible to participate, as to--

> (i) any class, unit, or group of individuals
> covered by such program, any eligibility factors
> for such program, and any time limits applicable
> to such program; and

> (ii) the job titles and ages of all individuals
> eligible or selected for the program, and the
> ages of all individuals in the same job
> classification or organizational unit who are not
> eligible or selected for the program.

29 U.S.C. § 626(f)(1). "The OWBPA . . . incorporates no

exceptions or qualifications." *Oubre v. Entergy Operations,*

*Inc.*, 522 U.S. 422, 427 (1998); *see also Ruehl v. Viacom, Inc.*,

500 F.3d 375, 381-82 (3d Cir. 2007). "[T]he party asserting the

validity of a waiver shall have the burden of proving . . . that

a waiver was knowing and voluntary . . . ." *Id.* § 626(f)(3).

In this case, the Court has already found that the Release

complies with most of the OWBPA's requirements, as several

requirements are substantially similar to the totality of the

circumstances factors. Specifically, the Release meets the

requirements of 29 U.S.C. § 626(f)(1)(A)-(B), (D)-(G).[12] Thus,

the Court need address only whether the Release complies with 29

U.S.C. § 626(f)(1)(H).

---

[12] The parties agree that the Release complies with 29 U.S.C.
§ 626(f)(1)(C), which provides that a waiver may not prohibit the employee
from bringing claims arising after the date of the waiver's execution. The
Release here comports with this requirement. (Release ¶ 13(e)).

Section 626(f)(1)(H) requires employers to provide employees who are terminated as part of a termination program, such as a reduction in force,[13] with information about the program. In particular, employers must supply the terminated employee with the criteria for eligibility for the program and with lists of the ages and positions of both employees who were terminated through the program and those who were retained. *Id.* § 626(f)(1)(H)(i)-(ii). An "employment termination program" takes place when a group or class of employees are involuntarily terminated and "offered additional consideration for their decision to sign a waiver." 29 C.F.R. § 1625.22(f)(1)(iii)(A) (2012). "Typically, an involuntary termination program is a standardized formula or package of benefits that is available to two or more employees . . . ." *Id.* § 1625.22(f)(1)(iii)(B).

The record shows that Kellogg complied with both provisions. The Severance Plan clearly states its eligibility criteria. (Severance Plan 1-2) In addition, the Employee Separation Packet included the required lists. The first list is titled "Blue Anchor – Eligible" and contains the job titles and birthdays of the two employees terminated at the Blue Anchor facility, which includes Recchia. (Compl. Ex. B) The second

---

[13] Kellogg argues that even though it "treated the waiver as being requested in 'connection with . . . a reduction-in-force,'" K-Lean was not designed to be a reduction-in-force program. (Def.'s Reply Br. 6 n.2) However, as K-Lean meets the EEOC's definition of an reduction in force, 29 C.F.R. § 1625.22(f)(iii)(1)(B), the Court will treat it as such.

list is titled "Blue Anchor – Not Eligible" and has the job titles and birthdays of all retained employees.[14] (*Id.*) There is no dispute that the Blue Anchor facility was the decisional unit. *See* 29 C.F.R. § 1625.22(f)(3)(ii)(C).

Contrary to Recchia's contention that Kellogg was required to provide the criteria for selection in the reduction-in-force program, the OWBPA requires only the disclosure of the eligibility factors for the Severance Plan. *See id.* § 1625.22(f)(1)(iii)(A)-(B) (defining "program" as the package of benefits offered, not the involuntary termination program); *see also Rupert v. PPG Indus., Inc.*, Nos. 07-0705, 08-0616, 2009 WL 596014, at *56-57 (W.D. Pa. Feb. 26, 2009) (following the EEOC regulations and finding that "program" refers to the benefits plan); *Ricciardi v. Elec. Data Sys. Corp.*, No. 03-5285, 2007 WL 576323, at *4 (E.D. Pa. Feb. 20, 2007) (holding that a release needed to include only the criteria for eligibility in

---

[14] Plaintiff argues here that Kellogg did not provide him with a list of ineligible employees when he was terminated. (Pl.'s Br. 26) But the record is clear that Kellogg did provide Recchia with this list. In fact, Recchia attached copies of both lists to his Complaint as part of the Separation Packet. (Compl. Ex. B) Indeed, Recchia's arguments surrounding the deficiency the OWBPA lists have been inconsistent. In her October 6, 2009 letter to Kellogg, Ms. Vigilante wrote that the OWBPA lists were deficient because they did not provide information regarding reductions in force in other Kellogg facilities. (Def.'s Ex. 11, at 2) In the Complaint itself Recchia did not even identify a missing list as a violation of the OWBPA, despite the fact that he listed several other violations. (*Id.* ¶ 38) Recchia now attaches only one of the OWBPA lists and argues that he never received the other one (Pl.'s Ex. 32), even though he has already provided the Court with both lists. (Compl. Ex. B) The Court is not persuaded.

the severance plan, not the criteria for termination).[15]  As

such, Kellogg has met the requirements of the OWBPA, and the

Release is valid with respect to Recchia's ADEA claims.  Summary

judgment will be granted for Kellogg on Counts II and III.[16]


# IV.

Kellogg has also moved to seal Exhibit 2 to its Motion for

Summary Judgment.  Exhibit 2 is a presentation that Celerant

prepared regarding the K-Lean program, its purpose, and its

implementation.  Kellogg certifies that the document contains

---

[15] The Court is aware that courts in other districts have concluded that "program" refers to an involuntary termination program, not the benefits program itself, with respect to the eligibility factor disclosure.  *See Pagliolo v. Guidant Corp.*, 483 F. Supp. 2d 847, 861 (D. Minn. 2007); *Faraji v. FirstEnergy Corp.*, No. 04-1493, 2007 WL 756750, at *5 (N.D. Ohio Mar. 7, 2007); *Merritt v. FirstEnergy Corp.*, No. 05-0586, 2006 WL 4568793, at *3 (N.D. Ohio Mar. 31, 2006); *Massachusetts v. Bull HN Info. Sys., Inc.*, 143 F. Supp. 2d 134, 147 n.29 (D. Mass. 2001); *see also Kruchowski v. Weyerhaeuser Co.*, 423 F.3d 1139, 1143-44 (10th Cir. 2005), *withdrawn and superseded on reh'g in part*, 446 F.3d 1090 (10th Cir. 2006).  But as noted in *Rupert*, 2009 WL 596014, at *56-57, none of these opinions discussed either the import of the EEOC regulations' definition of "program," or the significance of the absence of termination criteria in the EEOC's sample disclosure form, 29 C.F.R. § 1625.22(f)(4)(vii)(B).  In addition, almost all of these decisions trace back to a footnote in *Bull*, which did not discuss the EEOC's regulations at all.

Where a statute is ambiguous, as the OWBPA is here, the Court must defer to the agency's construction as long as "the agency's answer is based on a permissible construction of the statute."  *Chevron, U.S.A., Inc. V. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  The EEOC has made clear that for the purposes of 29 U.S.C. § 626(f)(1)(H), an involuntary employment termination program refers to the benefits program offered to terminated employees.  Given the level of deference required as well as the fact that the two district courts in this Circuit to have considered this question reached the same conclusion as the Court in this case, the Court finds that Kellogg was required to provide the eligibility factors for the Severance Plan, not for K-Lean.

[16] Because the Court finds that the Release precludes all of Recchia's claims, the Court does not address the parties' arguments on the merits of his claims.

confidential and proprietary information that could provide a competitive advantage for Kellogg's competitors or cause harm to Kellogg. (Def.'s Statement 3-4) In addition, Kellogg certifies that some of the information in the document is proprietary to Celerant and may provide a competitive advantage to its competitors. (*Id.* at 4)

A party seeking a motion to seal must explain "(a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive alternative to the relief sought is not available." *See* L.Civ.R. 5.3(c)(2). Kellogg has not explained what serious injury it will suffer if the document is not sealed, nor has it provided a less restrictive alternative to sealing the document.

Based on the information provided, the Court is not convinced that allowing the document to remain unsealed will cause actual harm to Kellogg or Celerant. The document details how to perform a restructuring that took place in a few Kellogg facilities over four years ago. The Court fails to see how unsealing this document would provide an advantage to Kellogg's competitors such that Kellogg will experience any serious

injury.[17]  As such, the public's interest in transparency far outweighs any potential harm to Kellogg.  Accordingly, Kellogg's motion to seal will be denied.

## V.

For the foregoing reasons, summary judgment will be granted in favor of Defendant Kellogg on all counts.  Defendant's Motion to Seal will be denied.  An appropriate Order accompanies this Opinion.

Date:  June 27, 2013

   /s/ Joseph E. Irenas _____
**Joseph E. Irenas, S.U.S.D.J.**

---

[17] Indeed, at oral argument counsel for Kellogg indicated that the passage of time had lessened the need for sealing the document.